**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Marvin Stephens, Jr., | ) | |
| | ) | Case No. 3:08CV00955 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final determination denying his claims for Disabled Childhood Supplemental Security Income Benefits (DCSSI).  Pending are the parties' Briefs on the Merits (Docket Nos. 17 & 19).  For the reasons set forth below, the Commissioner's decision is affirmed.

## I.  PROCEDURAL BACKGROUND

Plaintiff applied for SSI on August 27, 2004 (Tr. 64-66).  His claim was denied initially and upon reconsideration (Tr. 55-57, 61-63).  On April 3, 2007, a hearing was held on this matter before Administrative Law Judge (ALJ) James Horn.  Plaintiff, represented by counsel, Loretta Willey, and Witness Tizzy Smith, appeared and testified (Tr. 290).  The ALJ issued an unfavorable decision on May

17, 2007 (Tr. 32-41). The Appeals Council affirmed the ALJ's decision thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 5-7).

## II. FACTUAL BACKGROUND

Plaintiff's mother, Tizzy Smith, testified that her son resided with her, her husband and another son (Tr. 293). She was employed at Darlington House, a senior housing facility (Tr. 294).

Plaintiff's counsel identified Plaintiff's primary impairment as Legg-Calve ́-Perthes Syndrome, a degenerative disease of the hip joint (Tr. 296). Dr. Kimberly Artis and Dr. Aaron A. Buerk provided Plaintiff's primary care (Tr. 294).

Plaintiff's counsel recounted Plaintiff's medical history including his first surgery during which his physician released a tendon (Tr. 294). Thereafter, Dr. Buerk performed a release on both hips and changed the alignment of Plaintiff's left hip. Plaintiff's third surgery included removal of the deep part of plate and screw fixation of the left hip (Tr. 295).

Ms. Smith attributed Plaintiff's impairment to the surgery. Post surgery, Plaintiff walked "funny with a limp" (Tr. 297). In fact, Dr. Buerk's records showed that Plaintiff had a length discrepancy which had been corrected with orthotics (Tr. 298). Ms. Smith noted that before surgery, Plaintiff rode a bicycle, roller skated and played. After surgery, Plaintiff could not lift his legs to ride a bicycle (Tr. 299, 301). After skating, Plaintiff experienced pain in his legs the following day (Tr. 301). Sometimes the pain was so severe that Plaintiff had to use a walker (Tr. 299). Use of a walker was equally painful (Tr. 300).

Plaintiff was undergoing therapy to stretch his legs and resolve the stiffness (Tr. 301). Dr. Buerk advised Ms. Smith that Plaintiff would have to undergo hip replacement as an adult (Tr. 302).

Plaintiff had no difficulties in school. His grades were superior. As a third grader, he

was involved in video games and playing with friends.  Occasionally he skated (Tr. 303).  Although Plaintiff  was excused from participating in gym class, he seldom excused himself (Tr. 304).

When Plaintiff experienced pain, his mother gave him Tylenol #3.  In fact, she had given him Tylenol during the week preceding the hearing.  Plaintiff had crutches to assist him with ambulation as needed (Tr. 305).  Ms. Smith estimated that approximately three times a month, her son experienced excruciating pain that required medication (Tr. 306).

### III  MEDICAL EVIDENCE

In 1998, Plaintiff, seven years of age, was officially diagnosed with bilateral Legg-Calve´-Perthes disease, a degenerative disease of the hip joint (Tr. 121).

Plaintiff's placeless were considered normal on March 5, 2003 (Tr. 187).

On July 16, 2004, an x-ray confirmed that Plaintiff's abnormal right hip was compatible with the known history of Legg-Calve´-Perthes disease (Tr. 169).  The x-rays administered on September 6, 2004, did not show any changes since his previous examination on July 16, 2004 (Tr. 165).

Radiological views of Plaintiff's pelvis taken on July 26 and August 6, 2004, showed changes consistent with the known history of the Legg-Calve´-Perthes disease (Tr. 208).  On July 26, 2004, Dr. Aki Puryear prescribed physical therapy (Tr. 207).  Plaintiff was treated for an acute contusion of the right tibial shin on July 31, 2004 (Tr. 221-223).

Plaintiff presented to the emergency room on August 1, 2004 for failure to bear weight on his right leg (Tr. 172, 178).  Plaintiff underwent an adductor release on September 2, 2004 (Tr. 166-167). The pain persisted and Plaintiff was prescribed Morphine on September 6, 2004 (Tr. 161, 176, 180).

Dr. Jacob Zeiss, a staff pathologist at the Medical College of Ohio, noted slightly more pronounced compression of Plaintiff's pelvis on November 8, 2004 (Tr. 201).  On November 30, 2004,

Plaintiff was assessed for asthma management (Tr. 146-148).  Plaintiff was treated on December 2, 2004, for difficulty breathing (Tr. 137).  He was diagnosed with croup (Tr. 138).

Plaintiff was treated for bilateral hip pain on January 30, 2005 (Tr. 128).  Images of the left hip were normal.  The right hip showed signs of right femoral capital epiphysis (Tr. 134).

Dr. Gregory M. Georgiadis removed the leg brace on February 14, 2005.  As a result, Plaintiff's pain was minimal but he continued to walk with a limp at times (Tr. 143).

In May 2005, the left side was normal except for changes of avascular necrosis and the right side showed additional flattening of the necrotic femoral head (Tr. 210).

Physical therapy was prescribed to stretch the adductors on July 15, 2005 (Tr. 122).  Plaintiff was evaluated for physical therapy on July 18, 2005.  The plan included increasing Plaintiff's range of motion, increasing his strength in hip extension and decreasing the pain symptoms (Tr. 219).

The Toledo Public Schools published the results from the Standford Achievement Tests in May 2005.  Plaintiff tested average in word reading/vocabulary, word study, reading and reading comprehension.  He scored within the below average range for math, language and environment (Tr. 152).  His grade evaluation showed an average score in reading but above average scores in language, spelling, handwriting and mathematics.  He performed satisfactorily in social studies, science, physical education, music education and art education (Tr. 153).  By the end of the school year, Plaintiff's grades in mathematics declined from B to C (Tr. 154).

The surgical alignment showed near anatomic alignment on October 18, 2005 (Tr. 263).  The wound was well healed on October 25, 2005 (Tr. 246).  Plaintiff was prescribed a pain reliever on November 8, 2005, to treat moderate pain (Tr. 245).

4

In November 2005, Dr. Timothy Quinn found the view of Plaintiff's right hip was consistent with the progression of the Legg disease (Tr. 236). During the following March, Dr. Buerk found that Plaintiff was recovering well after surgical alignment on the left side (Tr. 234). Dr. Tamara Martin confirmed that Plaintiff's hips and pelvis were stable on March 21, 2006 (Tr. 259).

Denise McCarthy, a registered nurse, and Dr. Buerk opined on June 22, 2006, that Plaintiff could not sustain a reasonable walking pace over a sufficient distance to execute an age appropriate activity but that he did not need a device for ambulation. She further suggested that Plaintiff may have difficulty remembering. In their opinions, Plaintiff's impairment interfered very seriously with his ability to independently initiate, sustain and compete in age appropriate activities (Tr. 230-231, 281-284). On November 6, 2006, Dr. Buerk removed the hardware implanted on Plaintiff's left side (Tr. 243). The two views of Plaintiff's hips administered on November 28, 2006, were compatible with Plaintiff's disease and the site of the proximal left femur where the removal occurred was healed (Tr. 256).

## IV.  STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled for purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i) (Thomson Reuters/West 2009). A three-step sequential evaluation process is employed to determine whether an individual under 18 is disabled. The SSA will consider (1) whether the child is working; (2) whether the child has a medically determinable severe impairment which is expected to result in death, has lasted or is expected to last for a continuous period of not less than 12 months and, if so, (3)

5

whether the impairment or combination of impairments meets, medically equals, or functionally equals the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (2000) (the "Listings").  20 C.F.R. § 416.924 (Thomson Reuters/West 2009).  The SSA will find an impairment functionally equivalent to a Listing if the child has an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning.  20 C.F.R. § 416.926a(b)(2) (Thomson Reuters/West 2009).  For children over three years of age, the areas of development or functioning that may be addressed in considering functional equivalence are (1) cognition/communication; (2) motor skills; (3) social ability; (4) personal ability; and (5) concentration, persistence or pace.   20 C.F.R. § 416.926a(c)(4) (Thomson Reuters/West 2009).  The regulations provide that when standardized tests are used as a measure of functional abilities, a "marked limitation" is a valid score that is two standard deviations or more below the norm for the test.  20 C.F.R. § 416.926a(c)(3) (Thomson Reuters/West 2009).

## V.  ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

1.  Plaintiff was a child born on January 20, 1998.  Therefore, he was a school-age child on August 17, 2004, the date the application was filed.

2.  Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.

3.  Plaintiff had a severe impairment, namely, Legg-Calve Perthes disease.

4.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff did not have an impairment or combination of impairments that functionally equaled the listings.

6.  Plaintiff had not been disabled as defined in the Act since August 17, 2004, the date the application was filed.

6

(Tr. 32-41).

## VI.  STANDARD OF REVIEW

This Court can conduct judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security,* 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.  'Substantial evidence' means 'more than a mere scintilla.  *Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001).  It means such relevant evidence as a reasonable mind might accept. ' "  *Id.* (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  The court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."  *Id.* (*citing Key, supra*, 109 F.3d at 273).

## VII.  DISCUSSION

Plaintiff seeks reversal and/or remand of the Commissioner's final decision claiming that (1) his impairments meet 101.02A of the Listing, (2) the decision did not consider the period of surgeries separately, (3) the ALJ erred by requiring continuous disability, (4) the decision's alternative analysis of domains is inadequate and (5) the ALJ makes no credibility finding.  Defendant contends that ALJ

7

Horn (1) reasonably found that Plaintiff's condition did not meet or equal the Listing, (2) reasonably found and explained that Plaintiff's condition was not functionally equivalent to the Listing and (3) reasonably found that Ms. Smith's testimony did not suggest that Plaintiff was disabled.

A.     THE CHILD MEETS LISTING 101.02A, AS DOCUMENTED BY TREATING SPECIALIST BUERK.

Plaintiff's argument is twofold. First, Dr. Buerk is a treating source; consequently, his opinions are entitled to controlling weight. Second, the medically acceptable data provided by Dr. Buerk is sufficient to constitute an impairment as defined in 101.02A of the Listing.

1.     TREATING SOURCE

An ALJ must give the opinion of a treating source controlling weight if he or she finds the opinion to be well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the case record. *Woodard v. Astrue*, 2009 WL 2065781 (M. D. Tenn. 2009). A treating source is likely to be the medical professional most able to provide a longitudinal picture of the claimant's medical impairment. 20 C. F. R. § 404.1527(d)(2) (Thomson Reuters/West 2009). When the opinion of a treating source is not accorded controlling weight, an ALJ must consider such factors as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion. *Woodard*, *supra*, (*citing Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). This requirement of reason-giving exists to (1) enlighten a claimant who knows that his or her physician has deemed him or her disabled, (2) ensure that the ALJ properly applied the treating physician rule and (3) permit meaningful review of the ALJ's application of the rule. *Id.* (citations omitted ).

8

Dr. Buerk performed two surgeries and conducted Plaintiff's preoperative and postoperative care (Tr. 241, 243-251, 281-284). He conducted a consultative examination in August 2005, performed the surgery and reviewed Plaintiff's post operative status in October and November 2005 and removed the hardware in November 2006. The ALJ acknowledged Dr. Buerk as a medical source but not a treating source that could provide a longitudinal picture of Plaintiff's impairment as contemplated by the regulations. The ALJ stated why he did not attribute controlling weight to the opinions expressed by Dr. Buerk, relying on the infrequent examinations and the consistency of the opinions with the medical care he provided as a basis (Tr. 36 & 40). The ALJ's conclusions are consistent with the substantive and procedural rules.

## 2.      Listing 101.02

Plaintiff contends that he is impaired as defined in 101.02 of the Listing.

Section 101.02 states:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A.      Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 101.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters/West 2009).

Section 101.00B2b defines "What We Mean by Inability to Ambulate Effectively"

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters/West 2009).

Conceding that Plaintiff has a gross anatomical deformity there are three reasons that the medical record does not show the severity of Plaintiff's impairment to the extent that it meets the requirements of  Section 101.02 of the Listing.  First, the medically documented evidence shows chronic joint pain (Tr. 127, 128, 130, 131, 133, 134, 142, 157, 160, 162, 166, 170, 172, 180, 198, 206, 208, 209, 212, 214, 221 & 245).  The medically documented evidence does not show **chronic** stiffness although on September 3, 2004, pain and stiffness were deemed the causes of Plaintiff's limp (Tr. 166).  When examined at the orthopedic clinic on May 16, 2005, the attending physician noted that Plaintiff had bilateral tightening of the hamstring (Tr. 157).  These two documented instances do not constitute a persistent and lasting medical condition.

Second, there are no documented findings of medically acceptable imaging depicting joint space narrowing, bony destruction or stiffness.  None of the X-rays taken of Plaintiff's knees, hips or legs show joint space narrowing, bony destruction or stiffness (Tr. 126, 165, 169, 200, 201, 207, 209, 210, 221, 223, 226, 234, 245, 246 & 250).  The x-ray taken on July 31, 2004, specifically discounted any evidence of bony destruction (Tr. 222).

Third, there has been no demonstrated inability to ambulate effectively or independently initiate, sustain, or complete activities.  The medically documented evidence suggests that although Plaintiff walked with a limp, he ambulated effectively.  He walked to school, albeit with assistance, occasionally skated, played video games and played with his friends (Tr. 143, 166, 230).  Rarely did he fail to participate in organized school play (Tr. 304).

This evidence is not indicative of a child whose impairment interferes **very seriously** with his ability to independently initiate, sustain, or complete activities.  The ALJ could reasonably conclude

10

that since Plaintiff was able to ambulate effectively, he could not satisfy the criteria of Section 101.02 of the Listing.

### 3.      SHOULD THE ALJ CONSIDER THE PERIOD OF SURGERIES SEPARATELY?

Plaintiff claims that the period from the alleged onset date in July 2004, until the recovery ended from the second surgery in February 2006, should have been separately considered as the condition and treatments were most disabling during that period.  A brief period of a few months between recovery from the first surgery and the undergoing second surgery does not disqualify Plaintiff.  The Magistrate contends that Plaintiff is arguing that the ALJ erred in failing to consider the surgeries and attendant periods of rehabilitation as a continuous period of more than 12 months.

The ALJ clearly determined that although Plaintiff's impairment was severe, it failed to meet the  durational requirement that the impairment last or be expected to last for a continuous period of at least twelve months.  The ALJ noted that the term "disability" is defined in the Act as a medically determinable mental or physical impairment which results in marked and severe functional limitations and which can be expected to result in death or which has lasted or can be expected for a **continuous** period of not less than 12 months (Tr. 32).  The ALJ found that after surgical repair on September 2, 2004, Plaintiff was able to ambulate effectively, with a limp, by February 14, 2005.  Plaintiff underwent surgery in October 2005.  By June 2006, he was able to ambulate successfully, retaining the ability to engage in activities.  The procedure commenced again in November 2006 when the hardware was surgically removed from his body.  Based on his mother's testimony at the hearing in April 2007, Plaintiff was able to ambulate effectively with a limp.

Based on Ms. Smith's testimony and the submitted medical reports, the ALJ found that Plaintiff had not met his burden of proving that his functional limitations were expected to or lasted for a

**continuous** period of at least 12 months.  Even if the ALJ considered each exacerbation of Plaintiff's impairment, the surgery and recuperation period as a separate incident, the period never lasted for more than seven months.  Under those circumstances, Plaintiff's functional limitations neither met nor were expected to meet the durational requirements.

        **4.**      **DID THE ALJ ERR BY REQUIRING CONTINUOUS DISABILITY**?

Plaintiff argues that the ALJ should have evaluated whether the three surgeries and three periods of recuperation prevented sustained effective ambulation.

The ALJ did.  He evaluated each surgery, the consequences of the surgery and Plaintiff's period of recuperation (Tr. 36).  After each surgery, Plaintiff's condition tended to undergo moderate improvement.  After all surgeries were concluded, there was no evidence that Plaintiff was unable to ambulate successfully.  In fact, the evidence showed that Plaintiff could walk to school, roller skate and participate in gym class.  There is a lack of substantial evidence that all three surgeries and recuperation prevented sustained effective ambulation.

**B.**      **IS THE ALJ'S ALTERNATIVE ANALYSIS OF DOMAINS ADEQUATE?**

Plaintiff argues that if his impairment is not of the severity to meet the listing, disability may still be found as he has a marked impairment in two domains of childhood normalcy.  The two domains to which he refers are "moving about and manipulating objects" and "health and physical well being."

In making a determination as to whether a child's impairment meets or equals a listed impairment, the ALJ must consider whether the impairment, alone or in combination with another impairment, "medically equals, or functionally equals the listings."  20 C. F. R. § 416.924 (Thomson Reuters/West 2009).  Functional equivalency means that the impairment must result in "marked" limitations in two of six domains of functioning or an "extreme" limitation in one domain of

functioning.  20 C.F.R. § 416.926a(a) (Thomson Reuters/West 2009).  A marked limitation is one that interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." 20 C. F. R. § 416.926a(e)(2)(i) (Thomson Reuters/West 2009).

The ALJ considers how a child functions in his or her activities in terms of six domains, two of which include "moving about and manipulating objects" and "health and physical well-being."  20 C. F. R. § 416.926a(b)(1) (Thomson Reuters/West 2009).  In the moving about and manipulating for school age children, development of gross motor skills should permit movement at an efficient pace about  school, home, and neighborhood.  20 C. F. R. § 416.926a(j)(1) (Thomson Reuters/West 2009). The increasing strength and coordination should expand the child's ability to enjoy a variety of physical activities, such as running and jumping, and throwing, kicking, catching and hitting balls in informal play  or  organized  sports.   20  C.  F.  R.  § 416.926a(j)(1)  (Thomson  Reuters/West  2009).   The development  of  fine  motor  skills  should  enable  the  child  to  do  things  like  use  many  kitchen  and household  tools  independently,  use  scissors,  and  write.   20  C.  F.  R.  § 416.926a(j)(1)  (Thomson Reuters/West 2009).

The distinction of marked limitations is made if the child is frequently ill because of his or her impairments  or  has  frequent  exacerbations  of  his  or  her  impairment  that  result  in  significant documented symptoms or signs when assessing the health and physical well-being.  20 C. F. R. § 416.926a(e)(2)(iv)(Thomson Reuters/West 2009).  For purposes of this domain, frequent means that the child has episodes of illness or exacerbations that occur on an average of three times annually or once every four months, each lasting two weeks or more.  20 C. F. R. § 416.926a(e)(2)(iv) (Thomson Reuters/West 2009).

The ALJ considered whether Plaintiff's impairments were the functional equivalent of the listing (Tr. 35). He correctly concluded that Plaintiff's impairment did not result in marked limitations in the two specified domains. There was no medically determinable evidence of retarded development of Plaintiff's gross motor skills or his marked inability to move about school, home or the neighborhood. His mother claimed that he enjoyed a variety of activities such as playing with his friends, skating and playing on the computer. On the functional report completed by Plaintiff's mother, she determined that Plaintiff could manipulate to the extent that he could throw a ball, use scissors, work video game controls, dress/undress action figures, use a zipper, button his clothes, tie his shoes, bathe himself, brush his teeth, comb his hair, eat with cutlery and hang up his clothes (Tr. 74, 76). His grades reflected that he had satisfactory penmanship during the third grading period (Tr. 153). This evidence does not demonstrate marked inability to move about and manipulate objects.

The ALJ found that the medical records did show that Plaintiff was frequently ill because of his impairments or that he had frequent exacerbations of his impairment that resulted in significant documented symptoms or signs. In particular, there is no evidence that Plaintiff had episodes of illness or exacerbations that occurred on an average of three times annually or once every four months, each lasting two weeks or more. Plaintiff had three episodes of illness/exacerbation of his impairment that occurred in 2004 (Tr. 140, 161-165, 207, 209, 221). No episodes lasted two weeks. In 2005, Plaintiff had three episodes of illness/exacerbation of his impairment (Tr. 127-134, 141). Each episode lasted less than two weeks.

Substantial evidence does not support a finding that Plaintiff has a marked impairment in "moving about and manipulating objects" or "health and physical well-being" as defined under the Act. Accordingly, Plaintiff's alternate argument of functional equivalence fails.

14

## C.    DID THE ALJ FAIL TO MAKE A CREDIBILITY DETERMINATION?

The only witness in this case was Plaintiff's mother.  Plaintiff argues that the ALJ did not assess her credibility and failed to explain his reasons for discounting her testimony.  The Magistrate disagrees.  In fact, the ALJ found that the testimony of Plaintiff's mother supported his finding that her son was not disabled.  The ALJ relied upon the testimony of Ms. Smith regarding the infrequency of giving her son pain medicine and concluded that such schedule was inconsistent with a disabling condition.  Furthermore, Ms. Smith testified that since her son recovered from his final surgery, the only restriction placed upon his activities by Dr. Buerk was that he should ask to be excused from gym when his legs hurt.  She testified that her son had not done so after having his hardware removed.  Ms. Smith also testified that she had not found it necessary to take her son's walker to school to assist him.  Clearly, the ALJ relied upon and found credible the testimony of Ms. Smith regarding her son's activities and limitations.

## VIII.  CONCLUSION

For the above reasons, the Commissioner's decision is affirmed and the case is dismissed.


/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:   08/07/09

15